Filed 8/30/13  Marriage of Ewing and Wignall-Ewing CA1/3
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of EDWARD EWING and CHARLEEN WIGNALL-EWING. | |
| EDWARD EWING,      Respondent, v. CHARLEEN WIGNALL-EWING,      Appellant. | A130732, A131665 (Napa County Super. Ct. No. 26-01959) |

In this family law matter, Charleen Wignall-Ewing (Charleen), mother to 16-year-old Edward (Eddie) and 14-year-old Charles, appeals from orders awarding greater timeshare to the children's father, Edward Ewing (Edward), denying her request for need-based attorney fees and a statement of decision, and granting Edward's request for attorney fees as sanctions.[1]  She contends the trial court:  (1) applied the incorrect legal standard in modifying custody and visitation; (2) denied her due process rights to a full and fair hearing; (3) erred in summarily denying her request for need-based attorney fees; and (4) erred in failing to provide a requested statement of decision.  We reject the contentions and affirm.

---

[1]  Both parties are representing themselves on appeal.  As is customary in family law cases, we will refer to the parties and their children by their first names for convenience and clarity, intending no disrespect.  (See *In re Marriage of Green* (1992) 6 Cal.App.4th 584, 588, fn. 1.)

1

## FACTUAL AND PROCEDURAL BACKGROUND

In 2001, after trial on the issue of custody and visitation, the trial court awarded physical custody of the parties' children to Charleen, with joint legal custody and visitation rights to Edward. In doing so, the court noted there was a lot of anger between the parties that was impacting their ability to parent, and that Charleen was "the primary culprit in that regard." It also noted that while both parents loved their children, they were not "model parents" and that both parents, especially Charleen, had "engaged in some degree of parental alienation as to the other." The court also indicated Edward was the parent better able to provide the children with structure, as Charleen was "somewhat more laissez faire as far as [her] approach toward parenting, [which] . . . may put the children in some jeopardy from time to time." The court stated, however, that the age of the children was "a very real and substantial factor" because "very small children, one a little over two, and one about four and a half, . . . need a mother more than a father." The court stated, "So in weighing all of the factors, and particularly the age of the children at this point, I'm going to grant physical custody to [Charleen], with rights of visitation to [Edward]." The court further ordered that the children's visitation schedule with Edward would be alternating weekends, alternating major holidays, and three weeks during the summer.

In 2002, Edward filed a request to modify custody and visitation. He declared he had obtained a permanent restraining order against Charleen, who yelled profanities at him during custody exchanges and made harassing telephone calls and false police reports, among other things. He stated Charleen had "a severe anger management problem" and had been criminally charged with vandalism after losing her temper during a custody exchange and causing damage to her sister's vehicle in front of the children. Edward also noted that while the court relied heavily on the children's young ages in granting physical custody to Charleen in 2001, the children were a year older and Edward was now a kindergartener. In September 2003, the parties entered into a Stipulation and Order increasing Edward's visitation to alternating weekends, a weekday overnight, four weeks during the summer, and alternating holidays each year.

2

Almost seven years later, on July 19, 2010, Edward filed an order to show cause in which he sought to modify custody and visitation on the ground that the children were now 13 and 11 years old and had stated a "strong preference that they reside with [their father] at least 50% of the time." Edward declared he had "significant concerns . . . regarding complaints of volatility, chaos and turbulence in [Charleen's] home along with complaints of abuse directed at [the] children from both [Charleen] and her twin sister, . . . who has bi-polar disorder." He learned "exactly what ha[d] been going on" after obtaining police reports for incidents that had occurred in Charleen's home "over the last several years." There was one incident in which Charleen was warned she was going to be placed on a child abuse central index registry for "dragging [the parties'] older son . . . by the ankles on his back across the carpet and a stone hallway," causing him to suffer burns on his back and shoulder blades. Charleen was also on probation for a conviction by way of plea to a charge of animal neglect after her dog "was found [on] the street with numerous wounds and abscesses stemming from long-term neglect and was blind in at least one of his eyes." In June 2009, a neighbor reported to Child Protective Services that Charleen "drinks and drives, . . . will get into her car and start taking off when the boys are getting into the truck, or just forget them all together. . . . She . . . lets [the kids] drink beer and [lets] the boys decide when they go to school. She also does not take care of the children and . . . lets her bi-polar twin sister take care of the children and the sister can go off [any time]." In February 2010, Eddie called the police and reported that " 'his bipolar aunt' had stabbed him with a knife." When Edward learned of this incident from Eddie and contacted Charleen, she blamed Eddie and downplayed the incident.

Edward also discovered that Charleen had received a letter from Eddie's school principal stating Eddie had been tardy 20 times out of 60 days during the first trimester and tardy 18 days and absent 10 days with eight days remaining in the second trimester. The school principal told Edward that Charleen had asked the school not to provide Edward with information regarding the children. Charles was also having problems at school and had served six days of detention for not turning in approximately 31 homework assignments between February and April 2009. His progress report showed

3

he had three Fs and two Ds. Edward declared it had been "extremely difficult to co-parent" with Charleen, who refused to discuss any concerns he had about the children and made unilateral decisions regarding their school and outside activities. Edward began taking Eddie to school pursuant to Charleen's request and also tried to monitor the boys' school attendance and progress more closely, but just weeks later, Charleen left a message on Edward's answering machine stating he could no longer pick up Eddie or help him with school because she was " 'sick of seeing [Edward's] face.' "

Charleen opposed the change in custody and visitation on the ground that there had been no significant change of circumstance. She stated, however, that "it is not unreasonable for [Edward] to have additional time with [the boys], if the boys desire it." She proposed that the court consider input from the children about additional time with their father, and that a child custody evaluator be appointed. She further stated that "[m]any of the allegations in [Edward's] moving papers are unsubstantiated accusations from years ago" and that some are "either blatantly untrue or are mere innuendo." She stated she was "very involved in [the children's] education" and had made efforts to ensure their "attendance, punctuality and homework." She stated, "It is true that there was a problem when the school changed from starting at 8:35 [a.m.] to 8:30 [a.m.], and Edward is not an early riser. I have had to call [Edward] to have him help me with this problem." She denied dragging Eddie and said she "tried to carry him to his room . . . but he resisted and he did get hurt." She stated that her bi-polar sister was not living in her home and that the sister had not intentionally hurt Eddie with a knife. She was concerned that the boys were "abusive" towards her and displayed "anger towards women in general" after extended visits with their father. She said that Eddie drank alcohol with Edward's permission while in Edward's care. She denied making it difficult for Edward to co-parent and claimed that rather, she had "attempted to work with him on [their] parenting responsibilities."

In an order after hearing filed September 1, 2010, the court appointed an attorney for the children. After hearing from the parties at a hearing on September 23, 2010, the court issued interim orders for joint legal and physical custody with a visitation schedule

4

that would allow Eddie to live primarily with his father and visit his mother on alternating weekends, and would allow Charles to alternate from week to week with each parent. The court declined to order a custody evaluation as requested by Charleen and continued the matter to November 29, 2010 "for review of these temporary orders and to enable [minor's counsel] to prepare a full report."

Several weeks before the review hearing, Charleen filed a motion requesting: (1) a stay on the interim orders until a full evidentiary hearing took place; (2) a child custody evaluation; (3) separate counsel for each of the two children; and (4) attorney fees. On November 30, 2010, Charleen filed a written request for a statement of decision.

At a December 1, 2010 review hearing, counsel for Edward requested sanctions for having to respond twice to Charleen's requests for a custody evaluation, attorney fees, and separate attorneys for the minors, despite the fact that minors' counsel had stated he did not believe a separate attorney for Charles or a custody evaluation was necessary. Counsel argued the children had made their preferences "very clear," and that they wanted the litigation to end. She noted that Charleen had submitted 1,400 documents which "basically supplement and repeat and again regurgitate, the arguments in front of [the court] on September 23rd, 2010." Minors' counsel concurred that "it's like a second bite of the apple or change of opinion or change of mind by [Charleen]." Minors' counsel also noted that Charleen "sometimes" abused the power that she mistakenly believed she had as the "sole" physical custodial parent because under family law, the label " 'sole physical custody' has far less meaning . . . than legal custody does" and is essentially "meaningless when there is substantial time with both parents." Minors' counsel stated, "The kids see nothing but constant fighting. And from what I can tell with dealing with the file, it's coming primarily from [Charleen's] side of the equation. [¶] And so I think the joint legal and joint physical custody is a way of defusing the possibility of that abuse, of that term and concept." The court dismissed Charleen's motion as premature and adopted minors' counsel's recommendations regarding custody. After the court issued its order, Charleen stated, "I will ask the Court for a statement of

5

decision." The court stated, "I don't think that you actually made a timely request since this hearing started on September 23rd." Charleen stated she had filed a request for a statement of decision "yesterday" and that the law was that a request is timely as long as it is made "[b]efore it's submitted."

At a January 11, 2011 hearing on Edward's request for attorney fees and sanctions, the court stated, "Before we continue with the hearing . . . I want to clarify a couple of things with regard to my ruling on December 1st. [¶] One is the standard that I applied was not the change in circumstances standard because I concluded that both parties had significant periods of physical custody . . . . Therefore the standard that applies is the best interests of the children. [¶] Secondly, while I denied a request for statement of decision as untimely, in giving it some thought I realize that the type of motion that we had here is not the type of motion that requires a statement of decision, and so no statement of decision was required." The court denied Edward's request for attorney fees as sanctions but noted that Charleen had engaged in conduct that "has been frustrating to the efficient resolution of pending issues and that her overzealouness has, on several occasions, delayed the resolution of support and custody issues."

On February 9, 2011, the court issued an Order After Hearing in which it stated in part: "The Court finds that the best interest standard applies in this matter as both parents had significant periods of physical custody within the meaning of [section 3004]." The court found that the recommendations of minors' counsel "contained in his November 24, 2010 report are in the best interests of the minor children." The court "adopt[ed] the recommendations of [minors'] counsel . . . for permanent orders on custody and visitation as defined in [the report]" and set forth the new custodial arrangement in its order. The court further ordered that Charleen's motion be dismissed as "premature" and that her request for a statement of decision be denied.

6

## *Custody and visitation*

Custody and visitation orders are generally modifiable if modification is in the child's best interests. (Fam. Code, § 3022.[2]) Once a permanent custody order is in place, however, it may be modified only if there has been a "significant change of circumstances justifying a modification." (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256.) " '[The changed circumstance rule] provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements.' [Citation.]" (*Ibid*.) The changed circumstance rule, however, does not apply even after a final custody order is in place if "a parent requests only a change in the parenting or visitation arrangement not amounting to a change from joint custody to sole custody, or vice versa. Instead, the trial court considers a request to change the parenting or visitation arrangement under the best interests of the child standard." (*In re Marriage of Lucio* (2008) 161 Cal.App.4th 1068, 1072.)

Charleen contends the trial court erred in applying the best interests standard because Edward was seeking to modify physical custody from sole custody to joint custody. Edward responds the court used the correct test because he and Charleen already shared custody at the time he filed his motion, and he was simply requesting a change in the visitation schedule "to make his timeshare consistent with the boys' preferences." We need not—and therefore do not—decide which test should have been applied, because there is sufficient evidence in the record to support the court's order under either standard.

---

[2] All statutory references are to the Family Code unless otherwise stated.

7

When the initial custody order was established in 2001, the children were only two and four years old, and the court relied heavily on their ages in granting physical custody to Charleen with visitation to Edward.[3] By the time Edward sought modification in 2010, circumstances had changed significantly, as the children were 11 and 13 years old. They were able to state their preferences and made it clear, through counsel, that they wished to spend more time with their father. (See § 3042, subd. (a) ["If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation, the court shall consider, and give due weight to, the wishes of the child in making an order granting or modifying custody or visitation"].) In addition, as Edward set forth in his moving papers, serious concerns had arisen in recent years about how the children were doing while in Charleen's care. According to Edward, it had also become "extremely difficult to co-parent" with Charleen, who refused to discuss these issues and made unilateral decisions regarding the children's school and outside activities. Charleen declared the "accusations" were "either blatantly untrue or are mere innuendo," but any credibility determinations were for the trial court to make. (See *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670 ["All issues of credibility are for the trier of fact, and all conflicts in the evidence must be resolved in support of the judgment"].) There was ample evidence from which the trial court could find that there had been a significant change of circumstances that justified the change in custody and that modification of custody and visitation was in the children's best interests.

### *Due process*

Charleen contends the trial court denied her due process rights to a full and fair hearing. We reject the contention.

Charleen relies on the legislative policy behind section 217, subdivision (b), that "[a]ccess to justice requires that parties be able to appropriately address the court and

---

[3] We note that in granting sole physical custody to Charleen in 2001, the court stated that "very small children . . . need a mother more than a father." However, the law requires that custody determinations be made without regard to the parent's gender. (§ 3040, subd. (a)(1) [in determining custody issues, the court "shall not prefer a parent as custodian because of that parent's sex"].)

present their cases."[4] (Assem. Bill No. 939 (2009-2010 Reg. Sess.) § 1(b).)  The record shows, however, that both parties submitted declarations on the issue of whether custody and visitation should be modified.  Charleen also testified at length regarding the issue and detailed why she believed custody should not be modified as recommended by minors' counsel.  She also acknowledged she had submitted "about 15 declarations" from various witnesses, and Edward's attorney represented to the court that Charleen had submitted "1,400 documents . . . supplement[ing] . . . the arguments [she made] in front of [the court]."  To the extent Charleen complains she was not allowed to call her witnesses to the stand, the record supports the trial court's decision to disallow testimony on the ground that Charleen was unable to make an adequate offer of proof as to the relevancy of those witnesses's testimony.[5]  There was no denial of due process.

### *Attorney fees*

Section 2030, subdivision (a)(1), provides:  "In a proceeding for dissolution of marriage, . . . the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding."  In making its determination as to whether attorney fees and costs should be awarded, the trial court considers the respective needs and incomes of the parties.  (*In re Marriage of Popenhager* (1979) 99 Cal.App.3d 514, 525.)  The trial court is not restricted in its assessment of ability to pay to a consideration of salary alone,

---

[4] Section 217, subdivision (a), provides, "At a hearing on any order to show cause or notice of motion brought pursuant to this code, absent a stipulation of the parties or a finding of good cause . . . the court shall receive any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties."

[5]  She stated, for example, that a director at Sylvan learning center would testify that "[s]upplements and nutritional support is important, swimming is important," or that another witness would testify that the children were intelligent and qualified for "double scholarships."

9

but may consider all the evidence concerning the parties' income, assets and abilities. (*Meagher v. Meagher* (1961) 190 Cal.App.2d 62, 64.)

A motion for attorney fees and costs in a dissolution proceeding is left to the sound discretion of the trial court. (*In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 296.) In the absence of a clear showing of abuse, its determination will not be disturbed on appeal. (*Ibid.*) "[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made. [Citations.]" (*Ibid.*)

Charleen contends the trial court erred in summarily denying her request for "need-based attorney fees" under section 2030. Relying on the holding of *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1313, that a trial court's decision denying a request for attorney fees "must reflect an exercise of discretion and a consideration of the appropriate factors," she asserts that the order dismissing her motion as "premature" shows the court "affirmatively refus[ed] and fail[ed] to exercise its discretion" as required. We reject the contention.

Here, the record shows that the only "evidence" Charleen presented in support of her request for attorney fees was her conclusory statement that Edward's "financial resources are significantly greater than [hers]." On December 1, 2010, when her motion was scheduled to be heard, there was no mention of her request for attorney fees, and she presented no evidence or argument in support of her request. Further, there is nothing in the record indicating she filed a "current Judicial Council Income and Expense Declaration" as required by the Local Rules for the Superior Court of the State of California, County of Napa, rule 7.17. Thus, the court had no current financial information from which it could exercise its discretion regarding the parties' financial circumstances and grant or deny the motion on its merits. Notably, on appeal, Charleen fails to point to any evidence regarding even her own financial situation from which the

10

court could have even exercised its discretion.[6] Under these circumstances, it was reasonable for the court to not set forth its reasons for denying the request, other than to state—as it did in its Order After Hearing—that Charleen's motion, which included her request for attorney fees, was dismissed. There was no error.

### Statement of Decision

Code of Civil Procedure section 632 provides that at the request of any party, a court must issue a statement of decision that states "the factual and legal basis for its decision as to each of the principal controverted issues at trial." Charleen contends the trial court erred in failing to provide a requested statement of decision. Edward responds that a statement of decision was not required in this case because the court was ruling on his *motion* for a change in custody after a hearing—not a trial—and "[t]he general rule is that a trial court need not issue a statement of decision after a ruling on a motion." (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1497, quoting *Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 678.) Charleen replies that a statement of decision is required in any proceeding to determine child custody—not just trials—under a section 3022.3, which provides, "Upon the trial of a question of fact in a proceeding to determine the custody of a minor child, the court shall, upon the request of either party, issue a statement of the decision explaining the factual and legal basis for its decision pursuant to Section 632 of the Code of Civil Procedure." We need not—and therefore do not—decide whether a statement of decision was required in the instant case because we conclude that, despite denying Charleen's request for a statement of decision, the trial court issued an Order After Hearing that essentially

---

[6] In addition to not having financial information from Charleen, it appears the court also had minimal information regarding Edward's finances. The only information in the record before the court regarding Edward's current financial situation is a statement his attorney made at the January 11, 2011 hearing: "My client testifies at that December 15th hearing and tells you he's a 65 year old man who has basically depleted his 401-K. He has $30,000 to his name. He owns no home. And he has thousands and thousands of dollars in credit card bills that he has to pay as a result of his ex-wife's behavior throughout this litigation including the civil lawsuit that she filed against him that she lost also."

11

served as a statement of decision by setting forth "the factual and legal basis" for the court's decision as to custody and visitation matters. (See *In re Exterstein's Estate* (1934) 2 Cal.2d 13, 15 ["recitals" in a minute order were sufficient to satisfy the requirement of a statement of decision].)

Here, the trial court stated in its Order After Hearing that it was applying the best interests standard as opposed to the change of circumstances standard in determining custody because "both parents had significant periods of physical custody within the meaning of [section 3004]." The court further found that awarding greater custodial time to Edward was in the children's best interests. The court also referred to a report issued by minors' counsel, found the report to be persuasive, and adopted counsel's recommendations regarding timeshare and other custody-related issues. Thus, the court sufficiently explained in its Order After Hearing "the factual and legal basis for its decision as to each of the principal controverted issues at trial," i.e., whether Edward's custodial time with the children should be increased consistent with the children's wishes.[7] (See *In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 [" 'In rendering a statement of decision . . . a trial court is required only to state ultimate rather than evidentiary facts,' " and even an omission of findings on a material issue " 'is harmless error unless the evidence is sufficient to sustain a finding in the complaining party's favor' "].) There was no error.

## DISPOSITION

The judgment is affirmed. Respondent Edward Ewing shall recover his costs on appeal.

---

[7] Charleen, who made only a general request for a statement of decision in which she did not specify what questions she wished the court to answer, does not assert on appeal that she had any additional questions she wished for the court to decide, or that the Order After Hearing did not sufficiently explain the factual and legal basis for the court's decision.

_____

McGuiness, P. J.

We concur:

_____

Pollak, J.

_____

Jenkins, J.